Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/21/2020 08:09 AM CDT

State of Nebraska, appellee, v.
Preston Pope, appellant.

___ N.W.2d ___

Filed May 29, 2020.    No. S-18-1151.

1. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court.

2. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

3. **Identification Procedures: Due Process: Appeal and Error.** A district court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.

4. **Jury Instructions: Proof: Appeal and Error.** In reviewing a claim of prejudice from jury instructions given or refused, the appellant has the burden to show that the allegedly improper instruction or the refusal to give the requested instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

5. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

6. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant

has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

7. **Homicide: Juries: Verdicts.** The jury need only be unanimous as to its verdict that defendant committed first degree murder, and not as to the theory which brought it to that verdict.

8. **Homicide: Jury Instructions: Proximate Cause.** A defendant in a felony murder case is not entitled to a proximate cause instruction when there is no dispute as to the victim's cause of death.

9. ____: ____: ____. In the context of felony murder, an instruction on proximate cause is appropriate where the evidence presents a jury question as to whether the death of the victim was proximately caused by an act of the defendant or the defendant's accomplice.

10. **Jury Instructions.** A trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record.

11. **Trial: Witnesses: Testimony.** Neb. Rev. Stat. § 25-1141 (Reissue 2016) does not apply to testimony given by a different witness when no objection is made to that witness' testimony.

12. **Constitutional Law: Identification Procedures: Due Process.** The Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.

13. **Identification Procedures: Police Officers and Sheriffs: Motions to Suppress.** Suppression of identification evidence on the basis of undue suggestion is appropriate only where the witness' ability to make an accurate identification is outweighed by the corrupting effect of improper police conduct.

14. **Trial: Identification Procedures.** When no improper law enforcement activity is involved, it suffices to test the reliability of identification testimony at trial, through the rights and opportunities generally designed for that purpose, such as the rights to counsel, compulsory process, and confrontation and cross-examination of witnesses.

15. **Evidence: Appeal and Error.** An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence presented; such matters are for the finder of fact.

Appeal from the District Court for Douglas County: Horacio J. Wheelock, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Heavican, C.J.

## INTRODUCTION

A jury convicted Preston Pope of two counts of first degree murder for the killing of Deprecia Neelon and Garion Johnson, two counts of use of a deadly weapon to commit a felony, and one count of possession of a deadly weapon by a prohibited person. On appeal, Pope challenges two of the district court's jury instructions, the affidavit relied upon by law enforcement to obtain a warrant to collect a sample of Pope's DNA, and the identification of Pope by one of the State's witnesses. We affirm.

## BACKGROUND

This case involves three shootings which occurred in Omaha, Nebraska, on August 5, 6, and 8, 2015. Neelon lived in a house on Pinkney Street with other family members, including her mother, stepfather, and stepsister, Marcella Mitchell (Marcella). On August 5, 2015, Johnson's vehicle was parked in the street outside Neelon's home. While Johnson was sitting in the driver's seat with the door open, an individual walked up and fired a gun at him. Johnson pushed the shooter and ran away as the shooter chased him.

Marcella and her sister had been standing by the street and were able to see the shooter. Marcella reported that a man dressed in black had walked past her toward Johnson. After hearing the gunshot, Marcella heard a clip drop. She then saw the shooter bend down and pick up the clip before chasing after Johnson. Marcella described the individual as being a light-skinned African-American male, approximately 5 feet 5 inches tall, and wearing a black jacket with a hood, black

pants, and frizzy braids in his hair. She estimated that she had been approximately three to four steps away from the shooter and was able to see his face for at least 3 seconds.

The next day, someone splashed an accelerant onto the siding of Neelon's house on Pinkney Street and lit the house on fire. Upon discovering that the house was on fire, Neelon had gone outside to investigate and was shot seven times. Neelon's stepfather was home at the time and attempted to pull Neelon back into the house after she had been shot. As Neelon's stepfather was attempting to pull her inside, someone fired three to five additional shots. When Neelon's stepfather saw the shooter point the gun in his direction, he was forced to let go of Neelon and close the door. Neelon died as a result of her gunshot wounds.

After Neelon was shot, several suspects had been observed leaving the area of her house on Pinkney Street in two separate vehicles: a blue/green minivan with a distinctive rust pattern and a white four-door sedan. Evidence recovered at the scene included a watch, a black knit glove, and three .45-caliber spent shell casings. A manufacturer's tag from a pair of knit gloves was located in an alley approximately one block away where the minivan had been parked. A fingerprint on the tag was found to match the left thumb of Marcus Short. DNA testing on the watch indicated that Short and another man could not be excluded as partial DNA contributors to a DNA mixture found on the inside of the device.

Johnson lived in a house on Fontenelle Boulevard. On August 8, 2015, law enforcement was dispatched to Johnson's address for a report of a shooting and a vehicle that crashed into a garage. Upon their arrival, officers found Johnson in a white Chevy Impala that had crashed into a garage located at a nearby address on Fontenelle Boulevard. Johnson had been shot seven times and died as a result of his gunshot wounds.

Because the area was muddy from a city sewer project, officers were able to follow the Impala's tire tracks to Johnson's

home. The tracks indicated that Johnson backed from his garage, drove in circles in two yards located along Fontenelle Boulevard, and then crashed into the nearby garage.

Johnson had been pulling his vehicle into his garage when two individuals standing by the driver's side of the vehicle began firing into the driver's-side window. Johnson backed the vehicle into the street. As he circled through the yards, one of the shooters followed the vehicle, firing into the window.

Witnesses reported that the shooters were two African-American males wearing black hooded sweatshirts, one of which had a red Nebraska logo on it. After the Impala crashed, the two shooters were seen running through yards and fleeing in a white Chevy Monte Carlo that had been parked toward the west. The Monte Carlo had white and blue in-transit plates.

Officers located a white Monte Carlo matching the vehicle's description at an address on Binney Street in Omaha, where Short resided with his grandmother. Law enforcement obtained and executed a search warrant at Short's residence. During execution of the warrant, officers seized multiple items from Short's bedroom, including two firearms—a .45-caliber handgun and a .357-caliber Magnum revolver, one black knit glove, a pair of "Mechanix" gloves, a black hooded sweatshirt, a black hooded sweatshirt with a red Nebraska logo, and black pants with dried mud on them.

As a result of the search, Short was arrested and charged with two counts of possession of a deadly weapon by a prohibited person. The State later dismissed the charges and filed an information charging Short with first degree murder for the killing of Johnson and use of a firearm to commit a felony.

When the firearms were dusted for fingerprints, Pope's partial palmprint was found on the barrel of the .357 Magnum. Ballistic test results demonstrated that spent projectiles recovered from Johnson's body had been fired from the .357 Magnum with Pope's palmprint on it. Two of the casings found at the scene of Neelon's murder were found to have been fired from

the .45-caliber handgun found in Short's bedroom. Officers located additional shell casings at each of the three shootings, but the shell casings were unable to be matched to either of the two firearms. However, ballistic tests demonstrated that these casings had all been fired from the same .45-caliber semiautomatic handgun.

On August 14, 2015, officers located a dark-colored minivan that matched the description of the minivan used by the suspects leaving Neelon's house on Pinkney Street after she was shot. The minivan was registered to Pope's mother, and Pope had been seen driving it. Cell phone records placed Pope in the area of Neelon's house near the time she was killed, and in the area of Johnson's house near the time he was killed. These records also indicated Pope was in the area of Short's home soon after Neelon was killed.

Law enforcement obtained a search warrant to get a sample of Pope's DNA under Neb. Rev. Stat. §§ 29-3301 to 29-3307 (Reissue 2016), Nebraska's identifying physical characteristics statutes. The warrant permitted the use of detention to obtain the sample. Pope was restrained after he refused to comply with the warrant. A buccal swab was used to collect DNA evidence at the Douglas County correctional facility where Pope was incarcerated on unrelated charges. DNA test results showed Pope as a major contributor to the DNA found on the black hooded sweatshirt and black pants that had been seized from Short's bedroom.

In April 2016, Marcella was at the Douglas County courthouse with a friend for reasons unrelated to this case. While there, Marcella saw Pope and recognized him as the August 5, 2015, shooter. Marcella later testified that after seeing Pope at the courthouse, she contacted the Omaha police officer who had initially interviewed her regarding the August 5 incident. Marcella reported that she had seen Pope at the courthouse and that she recognized him as the shooter.

In May 2016, the State filed an information charging Pope with first degree murder for the killing of Johnson, use of a

deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person.

In October 2016, Marcella was shown a photographic lineup by law enforcement, at which time she identified Pope as the August 5, 2015, shooter. Prior to both the lineup and her recognizing Pope at the courthouse, Marcella had seen a television news story about the investigation into Johnson's homicide. The news story aired a photograph of Pope wearing a bright yellow shirt. The photograph depicting Pope in the lineup was identical to the one used in the news story. Marcella later testified that upon seeing the news story, she thought she recognized Pope as the shooter, but did not contact law enforcement at the time because she was not sure. Marcella stated that when she later saw Pope at the courthouse, from the angle of his face when he walked and when he turned his face toward her, she was able to recognize him as the individual that ran past her on August 5, 2015.

In June 2017, the State filed amended informations against Short and Pope, charging each with a second count of first degree murder for the killing of Neelon and a second count of use of a deadly weapon. The district court ordered Short's and Pope's cases to be tried separately.

Prior to trial, Pope filed motions to suppress evidence of his DNA and of Marcella's identification. After a hearing on the motion to suppress evidence related to Pope's DNA, the district court determined the affidavit used to obtain the warrant lacked sufficient probable cause for issuance of the search warrant. The affidavit requested a sample of Pope's DNA for "comparison purposes." The affidavit stated that during the course of the investigation into Johnson's death, a search warrant executed at Short's home resulted in the seizure of two firearms, one of which had Pope's partial palmprint on it.

The district court noted that the affidavit failed to articulate a connection between the firearm and the homicide and failed to articulate a connection between the fact that Pope had

possessed the firearm and the fact that Pope was prohibited from possessing a firearm. Still, the court overruled Pope's motion to suppress after concluding the good faith exception applied. The court concluded that law enforcement's reliance on the warrant was reasonable because Pope had twice been convicted of felonies and his palmprint was found on a firearm.

Regarding Marcella's identification of Pope, Pope sought to suppress both the photographic lineup and any in-court identification on the grounds that Marcella's prior identification of Pope was unnecessarily and impermissibly suggestive. The motion was overruled. The district court found that the prior identification of Pope was not improperly suggestive and that Marcella's identification of Pope from the August 5, 2015, incident contained sufficient indicators of reliability to outweigh any alleged suggestiveness in the photographic lineup. At trial, both Marcella and her sister identified Pope as the August 5, 2015, shooter.

James Henderson testified that he had been driving in the area of Neelon's house on Pinkney Street and heard gunshots at the time she was killed. As he looked toward her house, Henderson saw the fire. He observed two males wearing all dark clothing standing near the front and the side of the house, and one of the males was holding a gun. Henderson stated that the two males, along with a third, ran across the street in front of his vehicle. Henderson recognized one of them. Henderson testified that he was later incarcerated with Pope and Short and that he recognized them as the other two males.

Pope was convicted on all five counts and sentenced to two terms of life imprisonment for the first degree murder counts, two terms of 49 to 50 years' imprisonment for the counts of use of a deadly weapon, and 49 to 50 years' imprisonment for possession of a deadly weapon by a prohibited person. The district court ordered Pope to serve his sentences consecutively to each other and to a federal sentence, which he was currently serving.

## ASSIGNMENTS OF ERROR

Pope's assignments of error, restated, are that the district court erred in (1) providing incorrect jury instructions on the felony murder and corresponding use counts and refusing to give Pope's tendered instruction, (2) providing incorrect jury instructions on the aiding and abetting a crime count and refusing to give Pope's tendered instruction, (3) failing to grant Pope's motion to suppress DNA evidence, and (4) permitting Marcella's identification of Pope.

## STANDARD OF REVIEW

[1] Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court.[1]

[2] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[2] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[3]

[3] A district court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.[4]

## ANALYSIS

*Jury Instructions.*

In his first and second assignments of error, Pope argues that the district court improperly instructed the jury on the elements of felony murder and aiding and abetting a crime.

---

[1] *State v. McGuire*, 286 Neb. 494, 837 N.W.2d 767 (2013).

[2] *State v. Weathers*, 304 Neb. 402, 935 N.W.2d 185 (2019).

[3] *Id.*

[4] *State v. Cosey*, 303 Neb. 257, 927 N.W.2d 822 (2019).

Alternatively, Pope asserts that the district court erred in refusing to give his tendered instructions.

[4,5] In reviewing a claim of prejudice from jury instructions given or refused, the appellant has the burden to show that the allegedly improper instruction or the refusal to give the requested instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[5] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[6]

[6] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.[7]

*Felony Murder Instruction.*

[7] On the count of first degree murder for the killing of Neelon, the district court instructed on the alternate theories of either felony murder or premeditated murder. And, as this court has made clear, "the jury need only be unanimous as to its verdict that defendant committed first degree murder, and not as to the theory which brought it to that verdict."[8]

Pope makes two arguments with respect to the felony murder jury instruction. First, Pope argues that the district court erred by failing to instruct that for felony murder, the jury must find that Neelon's death was caused by the fire. Second, Pope argues that the district court erred by refusing to give his tendered instruction, which included these additional elements: (1) that the arson or attempted arson was the

[5] *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016).

[6] *State v. Mueller*, 301 Neb. 778, 920 N.W.2d 424 (2018).

[7] *Id.*

[8] *State v. Buckman*, 237 Neb. 936, 940, 468 N.W.2d 589, 592 (1991).

proximate cause of Neelon's death and (2) that there was no efficient intervening cause. Pope also sought to include the following definitions:

"Proximate Cause"

The defendant's aiding and abetting of another to kill Deprecia Neelon during the course [of] committing or attempting to commit arson, caused the death of Deprecia Neelon, if her death occurred in a natural and continuous sequence, and without the defendant's acts Deprecia Neelon's death would not have occurred. Proximate cause is a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred.

"Efficient Intervening Cause"

An efficient intervening cause is a new and independent act, itself a proximate cause of death, which breaks the causal connection between the original illegal act and the death.

The district court overruled Pope's objections and declined to give his tendered instruction. As to the material elements of felony murder, the jurors were instructed as follows:

1. That the Defendant, Preston Pope, intended to commit the crime of arson; and

2. That on or about August 6, 2015 the Defendant, Preston Pope, was in the course of committing or attempting to commit that arson; and

3. That the Defendant, Preston Pope, did so in Douglas County, Nebraska; and

4. That the Defendant, Preston Pope, either alone or by aiding and abetting another, killed Deprecia Neelon during the course of committing or attempting to commit that arson; and

5. That the arson, or attempted arson, consisted of each of the following elements:

. . . That the Defendant, Preston Pope, either alone or by aiding and abetting another intentionally perpetrated

an arson, to wit: A person intentionally damages a build-
ing or property contained within a building by starting a
fire or causing an explosion when another person is pres-
ent in the building at the time and either;
    (a) the actor knows the fact; or
    (b) the circumstances are such as to render the presence
of a person therein a reasonable probability.

At trial, Pope argued that the shooting itself was an efficient
intervening cause, which broke the causal chain of events
between the arson and Neelon's death. On appeal, Pope claims
that because the jury was not required to find that Neelon's
death was caused by the fire, he is entitled to a reversal of both
the felony murder conviction and the corresponding use of a
deadly weapon conviction. Pope asserts that the jury should
have been instructed that felony murder requires proof that
Neelon's death came as a continuous sequence from the arson
and that the arson and the death were closely connected in time
and place. Alternatively, Pope argues that the district court
erred in failing to give his tendered instruction.

In *State v. Harris*,[9] this court held that a causation instruc-
tion was appropriate under the facts presented. The defendant
had been found guilty of first degree murder for the killing of
an 81-year-old woman during an attempted robbery. The vic-
tim had fallen to the ground and was kicked after she resisted
the attempt of the defendant and his accomplice to snatch her
purse. The victim suffered a broken hip either from the fall
or from being kicked by her assailants and was hospitalized.
Surgery was performed to treat the hip fracture, and although
the hip eventually healed, the patient died approximately 6
weeks after the attempted robbery.

At trial, the defendant in *Harris* presented evidence dem-
onstrating that the victim had suffered a myocardial infarction
and a systemic infection after the surgery and argued these
were independent intervening causes of her death. The jury

―――――――――――
[9] *State v. Harris*, 194 Neb. 74, 230 N.W.2d 203 (1975).

was given a causation instruction along with the definitions of "proximate cause" and "efficient intervening cause." In that case, we held that the defendant was entitled to an instruction on causation because the evidence had raised a factual question for the jury regarding whether the victim's death had been caused by the defendant or by independent intervening acts or causes.[10]

[8] However, in *State v. Quintana*,[11] we concluded that the defendant, David Lee Quintana, was not entitled to a proximate cause instruction because there was no dispute as to the victim's cause of death. Quintana had been convicted of first degree murder for aiding and abetting Jaime Rodriguez to commit the crime of robbery, during which Rodriguez shot and killed the victim. Quintana's defense was that the robbery was an afterthought and that the actual proximate cause of the victim's death was a derogatory comment made by the victim to Rodriguez, which caused Rodriguez to become angered and shoot the victim.

The jury instructions given at trial in *Quintana* required the jury to find, as an element of the offense, that the victim was killed during the course of Rodriguez' robbery of, or attempt to rob, the victim. The relevant part of the instruction stated:

"A death occurs while in the course of committing or attempting to commit a robbery if the act that killed is closely connected in time and place with the robbery or attempted robbery so that the act that killed and the robbery or attempted robbery may be considered one continuous event.

"If the intent to rob is formed prior to or contemporaneously with the act that results in death, then the death occurs in the course of the commission of the robbery or attempted robbery.

---

[10] *Id.*

[11] *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001), *modified on denial of rehearing* 261 Neb. 623, 633 N.W.2d 890.

"If the taking of the property was an after thought then the killing is not in the commission of a robbery or an attempted robbery and you should find the defendant not guilty of aiding and abetting first degree murder."[12]

On appeal, Quintana argued that the victim's remark was an efficient intervening cause, which severed the causal connection between the plan to rob the victim and the shooting, and that the trial court erred in refusing to give his proposed instruction on proximate cause.

[9] Noting that there was no dispute as to why Rodriguez shot the victim, we held that Quintana was not entitled to his proffered instruction on proximate cause. We explained that in the context of felony murder, an instruction on proximate cause is appropriate where the evidence presents a jury question as to whether the death of the victim was proximately caused by an act of the defendant or the defendant's accomplice.[13]

In *Quintana*, there was no dispute as to the cause of death; the question for the jury was whether the shooting occurred during the course of the robbery. We concluded that Rodriguez' motivation for shooting the victim did not affect the fact that the victim's death was caused by the shooting. And the question of whether an alternative motive for the shooting existed was related to whether the shooting took place in the course of the robbery.[14] We therefore held that an instruction on proximate cause was not required.[15]

In the present case, we find that the jury was properly instructed. Pope was not entitled to an instruction on causation because there was no dispute as to the proximate cause of Neelon's death; she died from her gunshot wounds. Nor was there a dispute as to whether the shooting was closely

---

[12] *Id.* at 59, 621 N.W.2d at 138 (emphasis omitted).

[13] *State v. Quintana, supra* note 11. See, also, *State v. Harris, supra* note 9.

[14] *Id.*

[15] *Id.*

connected in time and place with the arson.[16] Someone lit Neelon's house on fire, and when Neelon went outside to investigate, she was met with gunfire.

The question for the jury was whether Pope was responsible for the killing of Neelon, either by shooting her himself, by committing the underlying felony of arson, or by aiding and abetting the shooter and/or the individual committing the arson. The jury instructions required the jury to find, as an element of the offense, that "Pope, either alone or by aiding and abetting another, killed . . . Neelon during the course of committing or attempting to commit that arson." The jury was then instructed as to the elements of the crime of arson.

[10] Pope's tendered instruction is a correct statement of law.[17] However, in this case, the instruction was not warranted by the evidence.[18] A trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record.[19] We find that the instruction given regarding felony murder was a correct statement of the law and that Pope has not met his burden of establishing reversible error.

*Aiding and Abetting Instruction.*

In regard to aiding and abetting, the jury was given the following instruction from NJI2d Crim. 3.8:

> A person who aids, abets, procures or causes another to commit any offense may be prosecuted as if he were the principal offender.
>
> The Defendant can be guilty of a crime even though he personally did not commit every act involved in the crime so long as he aided someone else to commit it. The Defendant aided someone else if:

---

[16] See *State v. Perkins*, 219 Neb. 491, 364 N.W.2d 20 (1985).

[17] See *State v. Quintana, supra* note 11.

[18] See *id.*

[19] *Id.*

1. The Defendant intentionally encouraged or intentionally helped another person to commit the crime; and

2. The Defendant intended that the crime be committed; or the Defendant knew that the other person intended to commit the crime; or the Defendant expected the other person to commit the crime; and

3. The crime, in fact, was committed by that other person.

The Defendant can be guilty of felony murder if he is guilty of arson or attempted arson as an aider and a death resulted during the course of committing the arson.

Pope objected to the inclusion of the instruction and to the instruction's definition of "aider." Pope tendered an instruction with the additional language:

Aiding and abetting requires some participation in the criminal act which must be evidenced by word, act, deed, and mere encouragement or assistance is sufficient to make one an aider or abettor.

Evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory.

The district court overruled the objections and declined to use Pope's proposed instructions. However, the district court included the second sentence proposed by Pope within its definition of "aider."

Addressing the district court's refusal to give Pope's tendered instruction on aiding and abetting, we recognize that Pope's proposed language, taken from this court's opinion in *State v. Stubbendieck*,[20] is a correct statement of the law and was warranted by the evidence. However, we find that Pope failed to establish that he was prejudiced by the district court's refusal to give the tendered instruction.

The State argues that the language set forth in the instructions is functionally equivalent to Pope's first proposed sentence. We

---

[20] *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019).

agree. Two of the instructions stated that an "aider" must have "intentionally encouraged or intentionally helped another person to commit the crime." Further, the district court's instruction on the definition of "aider" included the second sentence proposed by Pope. The instruction stated: "Evidence of mere presence, acquiescence, or silence is not enough to sustain the State's burden of proving guilt under an aiding and abetting theory."

We conclude that Pope was not prejudiced by the district court's refusal to give his tendered instruction on aiding and abetting. Jury instructions must be read as a whole, and if they fairly present the law so that the jury could not be misled, there is not prejudicial error.[21] Here, the district court adhered to the Nebraska Jury Instructions,[22] and the instructions fairly presented the law and covered the issues presented. We conclude that Pope has not established prejudicial error.

*Evidence of Pope's DNA.*

In his third assignment of error, Pope argues that the district court erred in admitting evidence of his DNA. Pope asserts that the district court correctly found the affidavit used to obtain the warrant to collect his DNA was insufficient to support probable cause and that the district court erred in concluding that the good faith exception applied.

The State submits that Pope waived any objection to the admission of the evidence by failing to properly object at trial. We agree.

Neb. Rev. Stat. § 25-1141 (Reissue 2016) provides:

Where an objection has once been made to the admission of testimony and overruled by the court it shall be unnecessary to repeat the same objection to further testimony of the same nature by the same witness in order to save the error, if any, in the ruling of the court whereby such testimony was received.

---

[21] *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006).

[22] See NJI2d Crim. 3.8.

[11] During the testimony of the detective who had collected Pope's DNA, Pope was granted a continuing objection "regarding any DNA collection of . . . Pope." However, Pope failed to object to testimony by the State's DNA expert regarding the DNA results, which connected Pope to items of clothing seized from Short's home. Section 25-1141 does not apply to testimony given by a different witness when no objection is made to that witness' testimony.[23]

In order to properly preserve this alleged error on appeal, it was necessary for Pope to object to the admission of testimony by the State's DNA expert regarding the DNA results. Even assuming the district court erred in concluding that the good faith exception applied, Pope waived his right to assert this alleged error on appeal because he failed to properly object to the DNA results introduced at trial.

*Marcella's Identification of Pope.*

In his fourth assignment of error, Pope argues that the district court erred in denying his pretrial motion to suppress Marcella's identification of him as the August 5, 2015, shooter. Pope asserts that the photographic lineup was unduly suggestive because the photograph depicting Pope in the lineup was the same photograph that Marcella had seen on television during a news report about the case. Pope further asserts that the district court erred in its determination regarding the reliability of Marcella's identification.

[12-14] In *State v. Nolan*,[24] we articulated that "'the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances *arranged by law enforcement*.'" We explained

---

[23] *State v. Castillas*, 285 Neb. 174, 826 N.W.2d 255 (2013), *disapproved on other grounds, State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015).

[24] *State v. Nolan*, 283 Neb. 50, 63, 807 N.W.2d 520, 535 (2012) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012)).

that the suppression of identification evidence on the basis of undue suggestion is appropriate only where the witness' ability to make an accurate identification is outweighed by the corrupting effect of improper police conduct.[25] Finally, we determined that when no improper law enforcement activity is involved, it suffices to test the reliability of identification testimony at trial, through the rights and opportunities generally designed for that purpose, such as the rights to counsel, compulsory process, and confrontation and cross-examination of witnesses.[26]

In this case, Marcella had seen a photograph of Pope during a television news story about Johnson's murder. However, there was no evidence of improper law enforcement activity so as to render the lineup unduly suggestive. The parties stipulated that the detective who presented the photographs to Marcella was unaware of which photograph depicted Pope. And no evidence was presented to show that law enforcement was aware that the photograph had been used in the news story or that Marcella had seen the news story.

Pope argues that the brief length of time during which Marcella had to observe the shooter, Marcella's degree of attention at the time, her prior description of the shooter, her level of certainty, and the fact that 14 months had elapsed between the shooting and the photographic lineup are all factors weighing against the reliability of her identification of Pope as the shooter. However, absent evidence of affirmative police conduct tainting the identification procedure, a preliminary judicial inquiry into the reliability of the witness' identification is not required.[27] As discussed above, Pope presented no such evidence. Therefore, it was the jury's duty to assess the identification's reliability.[28]

---

[25] *State v. Nolan, supra* note 24.

[26] *Id.*

[27] See *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

[28] *State v. Nolan, supra* note 24.

[15] The jury heard Marcella's testimony and her cross-examination by Pope's counsel regarding each of the factors Pope uses to challenge the identification's reliability, including inconsistent statements Marcella made regarding her level of certainty and a discrepancy between Marcella's estimation of the shooter's height and Pope's actual height. It was the duty of the jury to assess Marcella's credibility and determine whether she had a sufficient opportunity to see Pope on August 5, 2015, and make a reliable identification of him as the shooter.[29] We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence presented; such matters are for the finder of fact.[30] We find that the district court did not err in permitting Marcella to identify Pope at trial.

## CONCLUSION

For the reasons outlined above, we conclude that Pope's assignments of error either are without merit or were not adequately preserved for appellate review. Pope's convictions are affirmed.

Affirmed.

---

[29] See *State v. Dixon, supra* note 27.

[30] *Id.*