Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/25/2022 08:07 AM CST

State of Nebraska, appellee, v. Aaron
Alcide Gaudreault, appellant.

___ N.W.2d ___

Filed January 18, 2022.    No. A-21-222.

1. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court.

2. **Criminal Law: Evidence: Appeal and Error.** When examining a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

4. ____: ____. A jury instruction which misstates the issues and has a tendency to confuse the jury is erroneous.

5. **Jury Instructions: Proof: Appeal and Error.** In reviewing a claim of prejudice from jury instructions given or refused, the appellant has the burden to show that the allegedly improper instruction or the refusal to give the requested instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

6. **Jury Instructions: Appeal and Error.** Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party.

7. **Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict surely

would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

8. **Criminal Law: Evidence: New Trial: Appeal and Error.** Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict.

9. **Evidence: New Trial: Double Jeopardy: Appeal and Error.** If evidence is not sufficient to sustain a verdict after an appellate court finds reversible error, then double jeopardy forbids a remand for a new trial.

Appeal from the District Court for Dawson County: James E. Doyle IV, Judge. Reversed and remanded for a new trial.

Brian J. Davis, of Davis Law, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Moore, Bishop, and Arterburn, Judges.

Bishop, Judge.

## INTRODUCTION

Following a jury trial, Aaron Alcide Gaudreault was convicted of resisting arrest. The Dawson County District Court sentenced him to 48 months' probation. On appeal, Gaudreault claims error regarding a supplemental instruction given to the jury in response to its question asking for a definition of "substantial force." He claims that if the jury had been properly instructed, there was insufficient evidence to support his conviction. We agree that the district court erred regarding its supplemental jury instruction. And since we cannot conclude the error was harmless, we reverse Gaudreault's conviction and remand the cause for a new trial.

## BACKGROUND

On February 18, 2020, the State charged Gaudreault with two counts: count I, resisting arrest, second offense, in violation of Neb. Rev. Stat. § 28-904 (Reissue 2016), and count II, first degree trespass, in violation of Neb. Rev. Stat. § 28-520 (Reissue 2016).

A jury trial on count I, resisting arrest, was held on November 17, 2020. The State called three law enforcement officers to testify. Gaudreault did not testify in his own behalf, but did call his mother as a witness. Additionally, a DVD containing footage from one law enforcement officer's body camera was received into evidence without objection.

Officer Bradley Peltier with the Cozad Police Department testified that on January 5, 2020, he received a call from dispatch in reference to an individual who was trespassing at an apartment. He went to the apartment and had contact with the complainant who advised that the suspect was Gaudreault, but that Gaudreault was no longer there. Gaudreault's vehicle was subsequently located at his mother's house in Cozad, Nebraska. Officers Peltier and Thomas Twyford arrived at that residence within 1 or 2 minutes of each other. They approached the front door, and Officer Peltier knocked while Officer Twyford stood a couple feet back; both were wearing their uniforms and badges. When Gaudreault came to the door, he was eating. Officer Peltier accused him of trespassing, which Gaudreault denied. Officer Peltier made the decision to arrest Gaudreault after seeing his behavior and how he was acting; Gaudreault also told Officer Peltier to "buzz the fuck off." Officer Peltier told Gaudreault that he was under arrest and that he should put down the food he was eating. Officer Peltier grabbed Gaudreault by the wrist, but Gaudreault tried to pull away. Officer Peltier then pulled Gaudreault onto the porch and onto the ground.

Officer Peltier was wearing a body camera during the interaction, and a DVD of the footage was received into evidence and played for the jury. While playing the DVD, the State repeatedly paused the video in order to ask Officer Peltier questions to describe what was happening. The State's questions and Officer Peltier's responses were as follows:

> Q. (By [the State]) Now, Officer Peltier, this is your body camera, so this is your view, is that correct?
>
> A. Yes.

Q. Who is that that just came into the scene?

A. That's Officer Twyford.

Q. Thank you.

(Video resumed.)

(Video paused.)

Q. . . . At this moment, are you attempting to place handcuffs on Mr. Gaudreault, Officer Peltier?

A. Correct, yes.

Q. And, you know, what we can't see is, you know, the physical sensations that you're experiencing. What do you feel as you are having contact with him as you're trying to put cuffs on him?

A. He's constantly pulling away, not allowing me to place his hands behind his back.

Q. Did it feel like he was using much strength to pull away?

A. I believe it was probably all of his strength to try to pull away.

Q. And at this point, did — was substantial force required on your part to try to get his other hand cuffed as shown in the video?

A. Correct. The porch there was confined space, so he kept rolling to where his arm without the cuff on was under him and unable to be grabbed to place him in the cuffs.

(Video resumed.)

(Video paused.)

Q. . . . So, at this time, only one hand is cuffed, is that correct?

A. Correct, yes.

Q. So, what are you doing?

A. Moving to the bottom of the walkway there, to the porch so that we had more room to be able to place him in cuffs.

Q. Was there further difficulty after you got down to that lower area?

A. He still pulled. He pulled and kicked the entire time.

(Video resumed.)

(Video paused.)

Q. . . . And at this point, it appears both of his hands are cuffed now, is that correct?

A. Correct, yes.

(Video resumed.)

(End of video.)

Q. . . . Officer Peltier, when you first told Mr. Gaudreault up [sic], you know, in the threshold there that he was under arrest, it seems that you reached for his arms, is that correct?

A. Correct, yes.

Q. And describe what physical sensation you felt when you did that?

A. He pulled like he was going to run back into the residence at that point.

Q. He pulled his arm away from you?

A. Yes, correct.

Q. And I think I already asked you this. Were you wearing your uniform, displaying your badge?

A. Yes, I was.

Q. And at that time, were you acting under color of your official authority as a police officer?

A. Yes.

Q. Were you focused on getting Mr. Gaudreault into handcuffs as a part of effecting his arrest?

A. Yes.

Q. And at what point were you able to actually handcuff him, both hands?

A. As soon as we got him pulled down to the bottom of the ramp up to the front door there where we could actually roll him onto his stomach and could actually effect the handcuffs going on both hands.

Q. Throughout that process, was he — what was he doing with that free arm?

A. Curling it under his body, pulling it away, trying not to allow us to put that free arm behind his back.

Q. And so, again, did you feel that substantial force was required on the part of you and Officer Twyford to overcome Mr. Gaudreault's efforts to place handcuffs on him?

A. Yes.

Q. When you were trying to place handcuffs on him. At any time throughout this process, I think you may have mentioned this earlier, but was Mr. Gaudreault hitting or kicking at or towards you or Officer Twyford?

A. He kicked at me several times as we were taking him from up by the front door down to the bottom of the ramp, he was trying to kick me.

Q. Did he ever connect with you?

A. A couple times.

Q. And is it your testimony that all these events occurred here in Dawson County on January 5th of this year?

A. Yes, sir.

Officer Peltier stated that, at the time of the interaction, Gaudreault had "the odor of an alcoholic beverage on his person[,] [a]nd, based upon prior contact with him, he appeared to be intoxicated by something."

On cross-examination, Officer Peltier was asked what he meant when he said he had to use "substantial force." He responded that it involved the "pulling, muscling, and the wrist lock" to get Gaudreault's hands behind his back. When asked what was the "physical force" that Gaudreault used against him, Officer Peltier responded, "Oh, resisting, pulling away, not allowing his hands to be placed behind his back to be put in handcuffs." Officer Peltier said he had Gaudreault's left wrist in a wrist lock, but Gaudreault "was curling his right arm underneath him" so that Officer Peltier could not grab it, and "Officer Twyford was trying to grab that arm and pull it behind his back." Officer Peltier was also asked about getting Gaudreault into the police car:

Q. [(by defense counsel)] And the second handcuff is put on. And does Mr. Gaudreault voluntarily stand up or did you lift him up?

A. We lifted him up.

Q. Did he walk to the police car, then?

A. No.

Q. Did you give him that option?

A. Yes.

Q. And then, did you have to shove him in the police car or did he get in there voluntarily?

A. Semi-voluntarily.

Officer Twyford also testified about his January 5, 2020, contact with Gaudreault. Officer Twyford was assisting Officer Peltier in regard to a possible trespassing. They made contact with Gaudreault at the front door; Officer Peltier explained the reason the officers were there, which was the trespass at a different address. According to Officer Twyford:

Mr. Gaudreault became upset, and Officer Peltier advised he was under arrest. Mr. Gaudreault appeared to try to go back inside of the home. He was standing in the doorway of the home. And Officer Peltier advised him again he was under arrest and pulled him outside to the front porch area, at which point, Mr. Gaudreault began trying to pull away and keep us from controlling him.

Officer Twyford explained that once Gaudreault was outside of the house, the officers' objective was to control him and place him in handcuffs. Gaudreault "was pulling away from us. He was rolling, trying to roll and pull away from us and yelling multiple different things." Officer Twyford was asked to describe what degree of strength he felt Gaudreault was using. He responded, "I don't know if I'd say it's strength. It was just easy for him to keep us from controlling him. He wasn't actively trying to hurt us, but he was pulling away not letting us secure him in handcuffs or control him." Officer Peltier was able to get one cuff on Gaudreault, but he was unable to get the second cuff secured. The area by the front

door was "a small area with a wooden railing and a ramp," and the small area made it "harder" to control Gaudreault. The officers decided to take Gaudreault down the ramp to a larger area where it was easier to control him. Once Gaudreault was brought to ground level, the officers were able to secure both of his hands. Officer Twyford was asked what level of force or strength he felt that he had to exert. He responded, "I feel it was pretty low level of force. We just secured his hands, had ahold of his hands. There [were] no strikes or anything like that used, pressure points." He was then asked if he felt like he had to use "significant muscle power to overcome Mr. Gaudreault's efforts." Officer Twyford responded, "Yes, I'd say so, yes." Officer Twyford did not recall being kicked by Gaudreault. The officers escorted Gaudreault to a law enforcement vehicle, and "there was some slight resistance" from him to get in the vehicle, but he did get in. Officer Twyford believed that Gaudreault was intoxicated during their interaction that day, stating, "I've had multiple contacts with Mr. Gaudreault, and at this contact, he was slurring his speech and seemed unsteady on his feet."

Deputy Chad Byrne with the Dawson County sheriff's office testified that on January 5, 2020, he overheard a call on the radio referencing a possible drunk driver leaving a residence in Cozad, so he went to see if the Cozad Police Department needed help. Upon arriving at the residence, Deputy Byrne observed Officers Peltier and Twyford on the ground with Gaudreault and there "appeared" to be a struggle to get handcuffs on him. The deputy testified that the "objective of handcuffing is to handcuff him behind his back," but Gaudreault "[w]asn't following instructions in giving [the officers his] hands and [was] forcefully keeping them in front." From his vantage point, the deputy could not tell if Gaudreault was moving around, but Gaudreault was yelling. The deputy exited his vehicle and ran up to them, but by that time, the officers had Gaudreault in handcuffs on the ground. The officers assisted Gaudreault in standing up. To Deputy Byrne's

knowledge, there was no one else outside besides the officers and Gaudreault. The deputy offered to transport Gaudreault, who appeared to be intoxicated, to the Dawson County jail. The officers "underhooked [Gaudreault] and forcibly brought him to [the deputy's] vehicle" for transport. During transport, Gaudreault was "verbally combative."

Gaudreault's mother testified that Gaudreault came to her home "late in the evening" on January 5, 2020, when she was already in bed. She "didn't really pay any attention [to him] until he said, 'Help. Mom.'" She then went into the living room and saw officers were there. The mother said:

> I came into the room and I didn't really see much. What I remember seeing is that he was, just kind of went limp and the police officers were dragging him out the door and down the ramp. And he was prone. He was on his back or side or something. I don't know.

She did not see Gaudreault hit or try to kick an officer, and she did not see him try to run away. Gaudreault "was kind of passive, crying and wanted me to help him, but I wasn't any help." The mother did not think that Gaudreault was struggling with the officers. Once the officers got Gaudreault on his feet, he walked to the law enforcement vehicle.

After both sides presented their case, the district court instructed the jury and submitted the case to them for deliberation at 4:31 p.m. At 5:40 p.m., the jury submitted a written question to the court, asking for a definition of "substantial force." The court conferred with counsel concerning the question and proposed a supplemental instruction. Gaudreault's counsel objected to the proposed instruction, stating that an answer to the jury's question was "probably not warranted by law." The objection was overruled. The supplemental instruction was subsequently read to the jury at 6:23 p.m., and the jury resumed deliberations. The jury returned a guilty verdict 10 minutes later at 6:33 p.m. Additional details regarding the jury question and supplemental instruction will be set forth in our analysis.

On November 18, 2020, the district court entered a judgment of conviction. Following a hearing in February 2021, at which Gaudreault admitted the validity of his prior convictions for resisting arrest, the court sentenced Gaudreault to 48 months' probation for the Class IIIA felony. The probation was to include 70 days in jail at the beginning of probation and 20 days in jail at the end of probation, the latter of which could be waived by the court if Gaudreault satisfactorily completed probation. Gaudreault was given credit for 10 days already served.

Gaudreault appeals.

## ASSIGNMENTS OF ERROR

Gaudreault assigns that (1) the district court committed plain error in providing a supplemental instruction to the jury defining "substantial force" and (2) the evidence admitted at trial was insufficient to sustain a guilty verdict.

## STANDARD OF REVIEW

[1] Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020).

[2] When examining a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019).

## ANALYSIS

Gaudreault was charged and convicted of resisting arrest. Under § 28-904(1):

A person commits the offense of resisting arrest if, while intentionally preventing or attempting to prevent a peace officer, acting under color of his or her official authority, from effecting an arrest of the actor or another, he or she:

(a) Uses or threatens to use physical force or violence against the peace officer or another; or

(b) Uses any other means which creates a substantial risk of causing physical injury to the peace officer or another; or

(c) Employs means requiring substantial force to overcome resistance to effecting the arrest.

"Substantial force" is not defined in either § 28-904 or Neb. Rev. Stat. § 28-109 (Reissue 2016) (terms defined for purposes of Nebraska Criminal Code).

### Supplemental Jury Instruction

After both sides presented their case at trial, the district court instructed the jury. The jury was given numerous instructions, including one instruction regarding the elements of the charged offense. That instruction was as follows:

### INSTRUCTION NO. 3

The State has charged the Defendant with one crime, resisting arrest.

The elements the State must prove by evidence beyond a reasonable doubt to convict Aaron Gaudreault of the crime of resisting arrest are:

1. That on or about January 5, 2020, Aaron Gaudreault;

2. intentionally prevented or attempted to prevent a peace officer;

3. acting under color of his official authority;

4. from effecting the arrest of Aaron Gaudreault;

5. by:

(a) using or threatening to use physical force or violence against the peace officer or another person, or

(b) use of any other means which created a substantial risk of causing physical injury to the peace officer or another person, or

(c) employing means requiring substantial force to overcome resistance to effecting the arrest; and,

6. that Aaron Gaudreault did so in Dawson County, Nebraska.

The State has the burden of proving beyond a reasonable doubt each one of the foregoing elements necessary for conviction, and this burden never shifts.

If you find from the evidence beyond a reasonable doubt that each of the foregoing elements is true, it is your duty to find the Defendant guilty of resisting arrest, mark an "X" in the verdict form where appropriate, stop your deliberations and notify the bailiff. If you find the State did not so prove, then you must find the Defendant not guilty of resisting arrest, mark an "X" in the verdict form where appropriate, stop your deliberations and notify the bailiff.

(Emphasis in original.) Instruction No. 4 included definitions for the terms "arrest," "intent," "intentionally," "knowingly," and "peace officer." Instruction No. 5 instructed the jury on the meaning of proof beyond a reasonable doubt. After instructing the jury, the court submitted the case to the jury for deliberation.

Slightly over an hour into its deliberations, the jury submitted a written question asking, "What is defined as substantial force[?]"

While outside the presence of the jury, the district court had a conference with both counsel, as well as Gaudreault, on the court's proposed supplemental instruction in response to the jury's question. The court's proposed instruction stated, "'By substantial is meant, real, not imaginary, illusory. Whether any particular conduct described by a witness or evidenced by a video recording was substantial force is a matter solely within the duty of the jury to determine the facts.'" The State had no objection to the proposed instruction. However, Gaudreault's counsel objected, stating, "We feel as though in the absence of a definition that I've been able to find in case law that this question — the answer to this question is probably not warranted by law. We'd ask — I want the objection noted for the record." The court responded, "All right, the objection's been considered. The words I've used, 'By substantial is meant

real, not imaginary, or illusory,' is based on my understanding of the word substantial, meaning having substance and not being real (sic) or imagined. So, that's why that's included. The objection's overruled." Counsel for the State, as well as Gaudreault and his counsel, all waived their right to be present when the court read the instruction to the jury.

We take a moment to note that due to the COVID-19 pandemic, the jury remained in the courtroom for its deliberations and breaks while everyone else was kept out of the courtroom. The jury had previously been informed that restrooms were in the hallway and in the jury room. This resulted in at least one juror being in the jury room where a dictionary was located.

When the district court met with the jury to provide the supplemental instruction, the following colloquy took place on the record.

THE COURT: We're on the record now in Case No. CR20-27, State of Nebraska versus Aaron Gaudreault. We are in the presence of the jury, the court reporter and the bailiff.

Members of the jury, you asked a question. I conferred with the lawyers and developed an answer to your question. Whenever we do this, I have to call them in to make sure they contribute to whatever I do. We are outside their presence now, because they said I could go ahead and be in your presence without them here.

After I got done doing this, I went to my office to go to the bathroom and a couple jurors went into the jury room. And I had left behind there one of my books that I was using to come up with the definition. And is Juror 66 here? Could you come up to this microphone, sir?

You were in the jury room right after I was in the jury room and you were going to the restroom, I think, and I think you had to wait a little while and the books were open there. Did you look up anything in the dictionary?

JUROR #66: I started to look up that word substantial, but before I got it done, she came in and —

THE COURT: The court reporter?

JUROR #66: Yeah.

THE COURT: You didn't get to look anything up, did you?

JUROR #66: No, I didn't.

THE COURT: Okay, I'm glad you didn't.

JUROR #66: I didn't have my glasses on, couldn't see much. I was getting to the S'es.

THE COURT: Yeah, well, . . . I just want to make sure you didn't look anything up, because I'd have to go through a different procedure if you did, okay.

All right, thank you, sir. I appreciate you, appreciate your honesty, as well.

The court subsequently addressed the jury, stating, "[A]fter I got the question from you, I met with the lawyers and I did some research, not just in dictionaries and books, but in cases that have been decided by appellate courts. And based on that, we've come up with this decision and this definition." The court then stated, "You are instructed as follows: 'By substantial is meant real, not imaginary or illusory. Whether any particular conduct described by a witness or evidenced by a video recording was substantial force is a matter solely within the duty of the jury to determine the facts.'" Ten minutes after the court provided the supplemental instruction to the jury, the jury found Gaudreault guilty of resisting arrest.

In its journal entry and judgment, the district court set forth the timeline of events leading up to the jury's verdict; the timeline is also reflected in the record. The court stated, in relevant part:

At 4:00 p.m. all 12 members of the jury returned to the courtroom and [the jury instructions were read and] closing arguments were made. . . .

At 4:3[1] p.m. the case was submitted to the jury and the jury was given the case for deliberations. At 5:40 p.m. the jury presented a question. While outside the presence of the jury, the court conferred with counsel

concerning the question on the record and in the presence of the defendant. A supplemental instruction was proposed by the court. The defendant's objection to part of the instruction was overruled. Counsel for the plaintiff and defendant waived their presence at the reading of the instruction to the jury.

At 6:2[3] p.m. the supplemental instruction was read to the jury.

At 6:33 p.m. the jury advised it had reached a verdict.

Gaudreault claims that the district court erred in providing a supplemental instruction to the jury defining substantial force that was contrary to law and in violation of his constitutional right to due process and a fair trial.

[3] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020).

Gaudreault argues that the supplemental instruction "provided a partial definition based on the Court's own understanding of the word 'substantial.'" Brief for appellant at 15. The supplemental instruction that was given allowed the jury to believe that the State "showing beyond a reasonable doubt that any force, as long as it was not imagined or an illusion, being used by law enforcement to overcome resistance could result in a conviction." *Id*. "This erroneous instruction replaced the jury as fact finders with the judge and enabled the jury to allow the [S]tate to convict Mr. Gaudreault for resisting arrest by proving less than what the statutory elements require in proving 'substantial force.'" *Id*.

Neither "substantial" nor "substantial force" is defined in either § 28-904 or § 28-109; definitions of such are also absent in the relevant Nebraska case law. A definition of "substantial force" does not appear in Black's Law Dictionary or Merriam-Webster's Collegiate Dictionary.

However, Black's Law Dictionary 1728 (11th ed. 2019) defines "substantial" as:

> 1. Of, relating to, or involving substance; material <substantial change in circumstances>. 2. Real and not imaginary; having actual, not fictitious, existence <a substantial case on the merits>. 3. Important, essential, and material; of real worth and importance <a substantial right>. 4. Strong, solid, and firm; large and strongly constructed <a substantial piece of Victorian furniture>. 5. At least moderately wealthy; possessed of sufficient financial means <a substantial supporter>. 6. Considerable in extent, amount, or value; large in volume or number <substantial support and care>. 7. Having permanence or near-permanence; long-lasting <the substantial presence of English-language books in libraries worldwide>. 8. Containing the essence of a thing; conveying the right idea even if not the exact details <a substantial portrait of the leader, even if some matters were slighted>. 9. Nourishing; affording sufficient nutriment <a substantial meal>.

(Emphasis omitted.) And Merriam-Webster's Collegiate Dictionary 1245 (11th ed. 2014) defines "substantial" as:

> 1 a : consisting of or related to substance b : not imaginary or illusory : REAL, TRUE c : IMPORTANT, ESSENTIAL 2 : ample to satisfy and nourish : FULL <a ~ meal> 3 a : possessed of means : WELL-TO-DO b : considerable in quantity : significantly great <earned a ~ wage> 4 : firmly constructed : STURDY <a ~ house> 5 : being largely but not wholly that which is specified <a ~ lie>[.]

(Emphasis omitted.) Both dictionaries include multiple meanings for the word "substantial," but the district court chose to use only one meaning in its supplemental instruction even though more than one meaning would have been applicable to the case. For example, the court chose to define "substantial" only as "real, not imaginary or illusory." However, "Considerable in extent, amount, or value," see Black's Law Dictionary, *supra* at 1728, or "considerable in quantity : significantly great,"

see Merriam-Webster's Collegiate Dictionary, *supra* at 1245, would have been relevant meanings as well.

[4] Gaudreault contends that by "using the Court's supplemental instruction, the jury was led to believe that [it] could convict simply because 'any' force, that was not imaginary force, was needed by law enforcement to overcome any resistance." Brief for appellant at 19. We agree. The district court gave a partial or incomplete definition of "substantial" in its supplemental jury instruction. By limiting its definition to "real, not imaginary or illusory," force, the district court misled the jury to believe that it need not consider the extent or amount of force required by officers to overcome Gaudreault's resistance. A jury instruction which misstates the issues and has a tendency to confuse the jury is erroneous. *State v. Clausen*, 307 Neb. 968, 951 N.W.2d 764 (2020). However our analysis does not conclude here. We must also consider whether the erroneous jury instruction was harmless.

[5] In reviewing a claim of prejudice from jury instructions given or refused, the appellant has the burden to show that the allegedly improper instruction or the refusal to give the requested instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020).

[6,7] Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party. *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019). Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id*.

We are unable to say that the district court's erroneous supplemental jury instruction was not harmless in this case. Section 28-904(1) contains three alternative subparts for

resisting arrest. We cannot tell from our record the extent to which the jury focused on § 28-904(1)(a) or (b) in reaching its verdict. However, it is clear on our record that the jury actively focused on § 28-904(1)(c), because it asked the court to define "substantial force." When speaking to the jury in advance of presenting the supplemental instruction, the court informed the jury it had "conferred with the lawyers and developed an answer" to their question. The court also indicated it "did some research, not just in dictionaries and books, but in cases that have been decided by appellate courts. And based on that, we've come up with this decision and this definition." The court thus gave the impression that both parties contributed and agreed to the definition, which Gaudreault's attorney did not, and further, the court implied that appellate decisions also supported the definition being supplied to the jury. The court then instructed the jury on the definition of "substantial," which as already discussed, was incomplete and potentially misleading. The jury reached its "guilty" verdict 10 minutes after receiving the erroneous supplemental instruction. Under these circumstances, we cannot say that the guilty verdict rendered was surely unattributable to the error. See *State v. Dady, supra*. Because the court's erroneous supplemental jury instruction was not harmless, we reverse Gaudreault's conviction for resisting arrest.

### SUFFICIENCY OF EVIDENCE
### AND DOUBLE JEOPARDY

[8,9] Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict. *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015). If it was not, then double jeopardy forbids a remand for a new trial. *Id.*

The elements for resisting arrest were set forth previously in this opinion. At trial, there was no dispute that Officers Peltier and Twyford were peace officers acting under color

of their official authority attempting to effectuate an arrest of Gaudreault. The question was whether Gaudreault intentionally prevented or attempted to prevent the officers from effectuating that arrest. Pursuant to § 28-904(1), Gaudreault could be found guilty of resisting arrest if he (a) used or threatened to use physical force or violence against the peace officer or another, (b) used any other means which created a substantial risk of causing physical injury to the peace officer or another, or (c) employed means requiring substantial force to overcome resistance to effecting the arrest. There was testimony given at trial that while the officers were attempting to place Gaudreault in handcuffs, he pulled away from the officers, kicked at them, and curled his free arm under his body so that the officers could not put that free arm behind his back and cuff his wrist. The officers had to "pull," "muscle," and use a "wrist lock" in order to get both handcuffs on Gaudreault. We conclude that the evidence was sufficient to sustain Gaudreault's conviction for resisting arrest. Double jeopardy therefore does not preclude a new trial.

## CONCLUSION

For the reasons set forth above, we reverse Gaudreault's conviction and remand the cause to the district court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.