IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. SIMPSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ARTHUR C. SIMPSON, APPELLANT.

Filed November 3, 2020.    No. A-19-923.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Ryan M. Hoffman, of Anderson, Bressman, Hoffman & Jacobs, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

MOORE, BISHOP, and WELCH, Judges.

MOORE, Judge.

I. INTRODUCTION

Arthur C. Simpson appeals from his convictions in the district court for Douglas County for assault by strangulation, negligent child abuse, unlawful discharge of a firearm, and use of a deadly weapon (firearm) to commit a felony. The court imposed sentences totaling 35 to 55 years' imprisonment. On appeal, Simpson challenges the court's denial of certain pretrial motions, the admission of testimony regarding the victim's background history, the failure to arraign him on the amended information, and the sentences imposed. He also asserts that he received ineffective assistance of trial counsel in various regards. For the reasons set forth herein, we affirm.

- 1 -

## II. BACKGROUND

### 1. INCIDENTS

The charges in this case stem from events that occurred on April 15 and 16, 2017. On the morning of April 16, law enforcement responded to a dispatch about "[s]hots fired" at a residence in Omaha, Nebraska. Officers who responded spoke with individuals standing outside and obtained a description of the parties involved, who had left the area. They also learned that a baby in a carrier had been located outside the residence in question.

The baby's mother, Christina Copeland, a resident at the address and one of the parties involved, returned to the scene after being contacted by officers, and she provided them with a summary of events. Copeland told officers that Simpson, who was her boyfriend and the baby's father, had repeatedly physically assaulted her throughout the morning, and that before he left the area on foot, he had fired a gun at her while she was in a vehicle. After canvassing the area, the officers did not locate Simpson, but they did find two bullet casings near the residence. Copeland was interviewed further at the police station, where an officer took photographs documenting her injuries.

The following day, police obtained an arrest warrant for Simpson, who turned himself in at some point.

### 2. CHARGES AND PRETRIAL PROCEEDINGS

On June 8, 2017, the State filed an information, charging Simpson with assault by strangulation in violation of Neb. Rev. Stat. § 28-310.01 (Reissue 2016), a Class IIIA felony; child abuse in violation of Neb. Rev. Stat. § 28-707 (Reissue 2016), a Class IIIA felony; unlawful discharge of a firearm in violation of Neb. Rev. Stat. § 28-1212.02 (Reissue 2016), a Class ID felony; and use of a deadly weapon (firearm) to commit a felony in violation of Neb. Rev. Stat. § 28-1205 (Reissue 2016), a Class IC felony. Assault by strangulation was incorrectly identified in the information as being a Class IV felony. The information stated that these violations occurred "[o]n or about 16 April 2017." Subsequently, Simpson filed a "Written Arraignment," waiving his right to physically appear for arraignment in district court and asking the court to enter a plea of "Not Guilty" on his behalf, which the court did.

On July 9, 2018, Simpson filed a pro se motion to suppress "all insufficient evidence, fabricated evidence, false reports, inadmissible hearsay, and all bias or prejudice by the State" based on his assertions that the Omaha Police Department (1) lacked sufficient proof that he discharged a firearm, (2) did not have a reasonable belief supported by specific facts that he was armed or had access to a firearm, (3) did not have a reasonable belief supported by specific facts that Copeland was strangled or assaulted by Simpson, and (4) did not have sufficient evidence or a reasonable belief supported by specific facts that Simpson was present at the time of the crime.

A hearing on Simpson's motion was held on September 26, 2018, and continued to November 27 for further evidence. Simpson was represented by counsel at the suppression hearing. At the start of the first hearing date, his attorney expressed his understanding of the issues raised in Simpson's motion as being a challenge to the probable cause for Simpson's arrest and a challenge to "some portion of the identification." The hearing proceeded based on that

understanding of the issues raised in Simpson's motion. Simpson's pro se motion did not clearly address whether he was seeking to suppress both the photographic lineup used when Copeland was interviewed at the police station and any in-court identification. His attorney's arguments at the hearing focused on whether the single photographic lineup used during the interview was unduly suggestive.

Over the course of the hearing, the district court heard testimony from several of the police officers who responded to and investigated the reports of gunshots and domestic violence. One officer testified about responding to the "ShotSpotter activation call" that morning, his initial actions upon arriving in the area, and his discussion with Copeland after she returned to the scene, during which she identified Simpson (by name and birthdate) as the person that had assaulted her. Another officer testified about her preparation of the affidavit for the arrest warrant. The State asked the district court to take judicial notice of "the affidavit of complaining witness that is contained within the court file," and the court indicated that it would do so. However, the affidavit was not marked, identified, and made part of the bill of exceptions.

On the second day of the hearing, a third officer testified about her interview with Copeland, during which Copeland again indicated that Simpson was her assailant. Copeland provided the officer with Simpson's name and date of birth, after which the officer located a copy of Simpson's driver's license photo and showed it to Copeland, who identified the person depicted as Simpson and indicated that he was the one who assaulted her. The court received into evidence a copy of Simpson's driver's license photo; the officer identified it as a copy of the photo shown to Copeland but noted that the exhibit had identifying info that she had "cropped out" first and did not contain Copeland's written notation identifying the person depicted as "[her] boyfriend, Arthur Simpson" as the original photo had been "placed in property or evidence down at police headquarters." The court also received a DVD copy of the officer's interview with Copeland. At the close of this hearing, the State asked the court to take judicial notice of "the affidavit for arrest warrant" contained in the court file because the prosecutor did not recall whether this had been done previously. Simpson's attorney indicated that he had no objection, and the court again took judicial notice of the affidavit. As before, the affidavit was not marked, identified, and made part of the bill of exceptions.

On December 26, 2018, the district court entered an order, denying Simpson's motion to suppress. Upon reviewing the DVD of the interview with Copeland, the court found ample probable cause for Simpson's arrest and that his constitutional rights were not violated. The court also found that the identification procedure was "performed appropriately and in no way was unduly suggestive under these particular circumstances." The court noted that prior to employing the photo identification procedure, the officer was fully informed that Copeland and Simpson were intimate partners. Accordingly, the court found that showing only Simpson's photograph to Copeland during the interview did not violate his constitutional rights.

Simpson also filed two pretrial motions in limine through his attorney. In the first motion, Simpson sought an order prohibiting the introduction, directly or indirectly, of evidence regarding Simpson's prior convictions, allegations by Copeland that Simpson physically abused or threatened her on any dates preceding the date of the offense charged, and allegations by any witness that Simpson physically abused or threatened any individual on any date. Simpson asserted

that such evidence was irrelevant and excludable pursuant to Neb. Rev. Stat. § 27-404 (Supp. 2019), and alternatively, that any probative value was outweighed by its prejudice to Simpson and that it should be excluded under Neb. Rev. Stat. § 27-403 (Reissue 2016). In the second motion in limine, Simpson sought the exclusion of "any evidence . . . regarding the date results in VeriTracks as reported by [the ankle monitor worn by Simpson]" because (1) "[t]he tracking method and procedures . . . are not technically sound," (2) "[t]he results shown are not accurate as to the provided location information, date, time, and device information," and (3) "[t]he probative value of such information is substantially outweighed by the danger of unfair prejudice." (Simpson was on parole at the time of the incidents at issue here and wore an electronic ankle monitor).

The district court ruled on those motions just before trial began. The court sustained the first motion. With respect to the electronic monitoring data, the court ruled that "as long as there's proper foundation, et cetera, laid when that individual comes and testifies here today or whatever, that the Court's going to allow that to be admitted." The court stated further, "There is going to be an issue as a result of this evidence, when we get to it, that the . . . issue of parole in reference to the defendant is going to have to be mentioned." The court noted and the State confirmed its agreement that the word "parole" would "be all that's mentioned" and that there would not be "any . . . solicited evidence of what prior convictions the parole is tied to or anything of that nature."

### 3. TRIAL EVIDENCE

Trial was held on July 22-25, 2019, with the first day being devoted to jury selection and the other 3 days to the presentation of evidence. The State's witnesses included Copeland, officers involved in the investigation, and individuals familiar with the GPS evidence from Simpson's ankle monitor. The State offered into evidence various exhibits, including photographs of the crime scene and Copeland's injuries, a recording of the 911 call made by Copeland on the morning of April 16, 2017, the shell casings retrieved from the crime scene, and a report containing GPS data from Simpson's ankle monitor during the relevant times. The district court denied Simpson's motion for directed verdict made after the State rested, and Simpson rested without presenting any evidence. The evidence presented by the State was voluminous. We summarize it here and have addressed additional details as necessary in the analysis below.

Copeland testified extensively about her background history, her relationship with Simpson, and the details of the crimes at issue. Shortly after Copeland began her lengthy recitation of her background, Simpson's attorney objected on the grounds of relevance, which objection was overruled by the district court. Simpson's attorney did not ask for a continuing objection, and he did not object again on the grounds of relevance during Copeland's testimony about her background. This portion of Copeland's testimony revealed that Copeland's parents abused drugs, that she ran away from home when she was 13 years old, that she then entered into a bad relationship lasting 8 years and during which she had four children, and that she then left Nebraska after another man offered her a modeling job, which turned out to be prostitution work instead and which she did off and on for 5 years before returning to Nebraska.

Copeland then testified about her relationship with Simpson. They met when she purchased drugs from him in late 2015 or early 2016, and they soon began dating. Their child was born in January 2017. Simpson visited her residence regularly, and they were still in a relationship at the

- 4 -

time of the incidents at issue. Shortly into their relationship, Copeland observed that Simpson wore a device on his ankle and learned that it was a form of electronic monitoring originating from Kansas City, Missouri. She described their relationship as good initially, but she testified that it had begun to deteriorate by the time she got pregnant.

Next, Copeland described the April 2017 incidents that resulted in the charges at issue. She described a series of events beginning on April 15 and concluding on the morning of April 16, during which Simpson left and returned to the residence multiple times, she and Simpson argued verbally, and Simpson assaulted her physically. The baby was in the residence during Simpson's physical assault of Copeland. During the assault, Simpson repeatedly punched and "chokeslammed" Copeland, which she described as him grabbing her by the neck with both hands and throwing her across the room. Simpson carried a gun at certain points during these events, which concluded on the morning of April 16 with Simpson leaving the baby outside in its carrier and departing on foot after firing the gun at Copeland as she departed by car. After driving away from the residence, Copeland borrowed someone's phone and placed a 911 call. After that, Copeland went first to her mother's house and then to a friend's house. Eventually, Copeland was notified that law enforcement had the baby and that she needed to return to the scene, which she did.

The State introduced considerable evidence that corroborated Copeland's account of what happened. Police officers testified about the injuries they observed on Copeland, consistent with the photographs taken by police showing the numerous red marks on her neck, swelling under her left eye, and a "busted" lip. Crime scene photographs showed debris from broken household items scattered inside the residence and damage to the front door. Police located two bullet casings outside of the residence, and they took custody of the baby, who had been retrieved by a neighbor. The GPS data showed that Simpson was in the vicinity of Copeland's residence during the relevant period and that he had tampered with his ankle monitor just after these incidents. The recording of Copeland's 911 call was played for the jury and was consistent with her account.

4. INFORMATION AMENDMENT, VERDICT, AND SENTENCING

Just prior to resting, the State moved to amend the information to "include April 15th going into April 16th" in the dates charged. The district court allowed the amendment, over Simpson's objection, stating that the State was correct in its position that it had the ability to amend up until it rested and that "the evidence has certainly been presented to support [the amendment]."

The jury found Simpson guilty on each count, although it found him guilty of misdemeanor child abuse (a Class I misdemeanor), rather than felony child abuse. The court accepted the verdicts and entered judgment accordingly.

During the subsequent sentencing hearing, the district court heard statements from the parties' attorneys and from Simpson. During his statement, the prosecutor informed the district court that assault by strangulation was a Class IIIA felony, rather than a Class IV felony, as stated by the court in earlier comments. The court then sentenced Simpson to the following terms of imprisonment for his convictions: 3 to 3 years for assault by strangulation, 1 to 1 year for negligent child abuse, 15 to 25 years for unlawful discharge of a firearm, and 20 to 30 years for use of a deadly weapon, with 874 days' credit for time served. The sentences on the first three convictions

were to run concurrently, and the sentence on the use of a deadly weapon charge was to run consecutive to all other sentences.

### III. ASSIGNMENTS OF ERROR

Simpson asserts, reordered and restated, that the district court erred in (1) denying his motion to suppress, (2) denying his motions in limine regarding references to him being on parole and regarding an expert opinion, (3) allowing extensive testimony regarding Copeland's history, (4) not ensuring he was properly arraigned or advised on the amended information, and (5) imposing excessive sentences.

Simpson also asserts that he received ineffective assistance of trial counsel when his counsel (a) failed to object to the district court taking judicial notice of a nonadjudicated fact; (b) failed to object to the victim's extensive, irrelevant, and prejudicial testimony about her background; (c) failed to object regarding Simpson's prior bad acts after having his motion in limine sustained; (d) failed to address the issues regarding Simpson's illegal sentence; and (e) because Simpson "did not believe that his attorney was effective." Brief for appellant at 3. Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). Simpson's final assigned error regarding ineffective assistance of counsel is a general allegation and clearly lacks the specificity required by *Mrza*. His other assigned errors regarding ineffective assistance have been alleged with enough specificity, and we have addressed them below.

### IV. STANDARD OF REVIEW

A district court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Martinez, supra.* An abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

A ruling on whether to allow a criminal information to be amended is made by the trial court in its discretion. *State v. Johnson*, 290 Neb. 369, 859 N.W.2d 877 (2015).

Whether a sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment presents a question of law. *State v. Becker*, 304 Neb. 693, 936 N.W.2d 505 (2019). When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Id.* An appellate court will not disturb a sentence imposed within the statutory

limits absent an abuse of discretion by the trial court. *State v. Lauhead*, 306 Neb. 701, 947 N.W.2d 296 (2020).

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Theisen, supra*. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020).

## V. ANALYSIS

### 1. COPELAND'S IDENTIFICATION OF SIMPSON

Simpson asserts that the district court erred in denying his motion to suppress, arguing that the single photographic lineup shown to Copeland when she was interviewed at the police station was unduly suggestive. He also argues that the single photographic lineup rendered the identification unreliable and inadmissible because Copeland was the only person to identify Simpson.

We first note that the police officer who testified about the lineup during the suppression hearing did not testify about this aspect of his interview of Copeland at trial. Nor did Simpson object to any of Copeland's trial testimony identifying him as the person who assaulted her and committed the other acts at issue. Where there has been a pretrial ruling regarding the admissibility of evidence, a party must make a timely and specific objection to the evidence when it is offered at trial in order to preserve any error for appellate review. *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019), *cert. denied* ___ U.S. ___, 140 S. Ct. 545, 205 L. Ed. 2d 345. The failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party will not be heard to complain of the alleged error on appeal. *Id.* Here, the evidence about Copeland's identification of Simpson in the photographic lineup was not admitted at trial, and Simpson did not otherwise object to her trial testimony identifying him as the individual committing crimes with which he was charged. Simpson has waived any error.

Even if Simpson had not waived this error, the record does not show that the district court erred in concluding that Copeland's identification of Simpson in the single photographic lineup was consistent with due process. The Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020). Suppression of identification evidence on the basis of undue suggestion is appropriate only where the witness' ability to make an accurate identification is outweighed by the corrupting effect of improper police conduct. *Id.* When no improper law enforcement activity is involved, it suffices to test the reliability of identification testimony at trial, through the rights and opportunities generally designed for that purpose, such as the rights to counsel, compulsory process, and confrontation and cross-examination of witnesses. *Id.*

Here, it is clear that Copeland and Simpson were in an intimate relationship and had a child together. Further, she identified him as her assailant, by name and birthdate, before being shown the single photographic lineup both at the scene and again at the police station. There is no evidence of affirmative police conduct tainting the identification procedure, making a preliminary judicial inquiry into the reliability of her identification necessary. See *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 4967 (2013) (identification procedure was not tainted by affirmative police misconduct so as to require preliminary judicial inquiry into reliability of victim's identification of defendant as her assailant). It was the jury's duty to assess the credibility of Copeland's trial testimony, and this court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence presented; such matters are for the finder of fact. See *State v. Dixon*, 306 Neb. 853, 947 N.W.2d 563 (2020).

For these reasons, Simpson's first assignment of error fails.

## 2. MOTIONS IN LIMINE

### (a) Motion Regarding References to Simpson's Parole

Simpson asserts that the district court erred in denying his motion in limine regarding references to him being on parole. In his brief, he notes several references made at trial to him being on parole, but he has not assigned the admission of those statements and testimony as error.

The State asserts that Simpson's arguments about trial references to him being on parole made during the prosecutor's opening statement and the testimony of several witnesses are not properly before this court because he did not object to these references or otherwise renew that particular motion in limine at trial. Because overruling a motion in limine is not a final ruling on admissibility of evidence and, therefore, does not present a question for appellate review, a question concerning admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection to the evidence during trial. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020). The State also notes that an appellant who has assigned only that the trial court erred in denying a motion in limine has not triggered appellate review of the evidentiary ruling at trial. *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020).

Simpson did object to one of the trial references to parole. During Copeland's testimony she was asked about the period of time her child with Simpson spent in foster care subsequent to the events in question, the child's return to her care, and at what point she became aware that Simpson had been arrested. Copeland testified to learning that "the foster care people" had been in contact with Simpson, and she stated, with respect to Simpson, "I don't think he knew at the time that I told about the shooting and everything, so he just thought he could turn hisself [sic] in for his parole for the stuff, and then they were just going to let him get the baby." Simpson's attorney objected and asked "that the record be stricken of any mention of parole," which objection was overruled by the district court. As noted above, however, Simpson failed to assign error with regard to this evidentiary ruling. Even if Simpson had assigned error to the admission of this testimony, rather than to just the overruling of his motion in limine, any error would be harmless as such testimony was cumulative of other evidence received at trial. See *State v. Hood*, 301 Neb. 207, 917 N.W.2d 880 (2018) (erroneous admission of evidence is generally harmless error and does not require reversal if evidence is cumulative and other relevant evidence, properly admitted,

supports finding by trier of fact). The parole officer who monitored Simpson in Nebraska testified without objection to the fact that Simpson was on parole. Because Simpson did not preserve the denial of his motion in limine by assigning error to the admission of the testimony by Copeland regarding parole, this assignment of error fails.

### (b) Motion Regarding Expert Opinion

Simpson asserts that the district court erred in denying his motion in limine regarding the expert opinion of Ashley Fuller. Fuller is an employee of a technology company that specializes in electronic monitoring. She analyzes GPS data from the company's devices and associated software system, determines if it is consistent with "valid working GPS," compiles the data into different formats for the company's customers (primarily law enforcement agencies throughout the country), and testifies about the data as necessary. At trial, she described her expertise as "[t]he integration of GPS into [the company's software system]." After eliciting this and other background information from her at trial, the State moved to qualify Fuller as an expert in that specific field. The court overruled Simpson's renewal of "the objections that were made in [his] motion in limine" and recognized Fuller as an expert in that area.

Fuller then testified further without objection about her background, how GPS works, and the monitoring devices and software system used by her company. Her company was asked by "the parole office for the State of Nebraska" to provide data from the device assigned to Simpson. She compiled a report, which included screenshots of the map associated with the software system and tracking data for Simpson's device from the requested time frame on April 15 and 16, 2017, which she testified "fairly and accurately depicted the tracking data" for Simpson's device. She testified further about how the data is collected and maintained in her company's records, after which the State offered the report into evidence. The court overruled Simpson's objections on the basis of foundation and hearsay and received the report.

Although Simpson did renew the objections of this second motion in limine at trial, as with his previous assignment of error, he has not challenged the admission of Fuller's testimony or the report at trial. He has simply assigned error to the district court's denial of his motion in limine concerning Fuller's expert opinion and has not triggered appellate review of the evidentiary rulings at trial. See *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020) (appellant who has assigned only that trial court erred in denying motion in limine has not triggered appellate review of evidentiary ruling at trial).

### 3. ADMISSION OF COPELAND'S BACKGROUND TESTIMONY

Simpson asserts that the district court erred in allowing extensive testimony regarding Copeland's history. As noted above, Copeland testified extensively about the circumstances of her life prior to her involvement with Simpson. Near the beginning of Copeland's testimony, Simpson's attorney objected on the grounds of relevance to this line of questioning, which objection was overruled by the court. Simpson's attorney did not ask for a continuing objection and did not object again on that ground, although he made various objections to Copeland's testimony once she began testifying about her interactions with Simpson and the events in question. Copeland was the last witness who testified on that particular day of trial, and following

Simpson's relevance objection, her background testimony continued until trial adjourned for the day. Just before adjournment, the court admonished the prosecutor to move on from testimony about Copeland's background, which the court characterized as having exceeded what was necessary to "humaniz[e]" Copeland. Copeland's testimony continued the next day of trial, and the State moved on to asking questions relevant to her relationship with Simpson and the events in question.

Aside from the one objection, Copeland's testimony about her background was admitted without objection, and any error in the admission of the portion of that testimony admitted without objection has not been preserved for appellate review. Failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020). And, while at least some of this testimony was arguably irrelevant, any error in admitting Copeland's testimony about her background was harmless. Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict surely would have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id.* Although Copeland's testimony about her background was extensive, in the entirety of the 3 days of trial devoted to evidence, Copeland's testimony about her background represented but a small portion of the overall evidence presented by the State. And the jury was instructed on the elements of the offenses and instructed not to allow sympathy or prejudice to influence their decision. Given the copious evidence about the crimes with which Simpson was charged, his guilty verdicts were surely unattributable to Copeland's testimony about her background. Any error in admitting that evidence was harmless.

### 4. Arraignment on Amended Information

Simpson asserts that the district court erred in not ensuring he was properly arraigned or advised on the amended information. He argues that he was never advised of the range of sentences under the amended information and was not provided with 1 day before having to stand trial on the amended information.

The original information alleged that Simpson committed the crimes with which he was charged "[o]n or about 16 April 2017." Prior to trial, pursuant to Neb. Rev. Stat. § 29-4206 (Reissue 2016), Simpson filed a written waiver of arraignment and plea of not guilty, which were accepted by the district court. The evidence at trial showed that the events in question began on April 15 and continued into April 16. At the close of the State's case, the prosecutor asked the court for permission to amend the information "to include April 15th going into April 16th," which motion the court granted over Simpson's objection. In doing so, the court noted that the evidence had been presented to support the amendment.

In support of his arguments, Simpson cites Neb. Rev. Stat. § 29-1816(1)(b) (Cum. Supp. 2018), which provides, "If the accused appears in person and by counsel and goes to trial before a jury regularly impaneled and sworn, he or she shall be deemed to have waived arraignment and a plea of not guilty shall be deemed to have been made." That is what happened here. And, as noted above, Simpson filed a pretrial "Written Arraignment" pursuant to § 29-4206. Although the actual written arraignment filed by Simpson is not contained in our record (we only have the court's order

accepting it and entering a not guilty plea on Simpson's behalf), § 29-4206 provides a form for such filings, including a statement that "in the event that the charges have been amended or new charges added I wish to waive a formal preliminary hearing or arraignment before the court and ask the court to enter plea(s) of not guilty on my behalf." Simpson clearly waived arraignment on the original information, and he does not argue that his written waiver did not cover an amendment to that information.

Simpson also cites Neb. Rev. Stat. § 29-1802 (Cum. Supp. 2018), which provides, "No one shall be, without his or her assent, arraigned or called on to answer to any indictment until one day has elapsed after receiving in person or by counsel or having an opportunity to receive a copy of such indictment." This section generally applies to informations, see Neb. Rev. Stat. § 29-1604 (Reissue 2016); however, the purpose of the 24-hour waiting period provided for by § 29-1802 is to ensure that the defendant has a reasonable amount of time to prepare his or her defense. See *State v. High*, 225 Neb. 695, 407 N.W.2d 772 (1987). Here, the amended information did not make any new or additional charges or raise matters of which Simpson was not previously aware; instead, the offense dates specified in the original information ("[o]n or about 16 April 2017") were amended at the close of the State's case to more closely conform to the evidence at trial (to specify "[o]n or about 15 April 2017 through 16 April 2017"). As such, Simpson was not arraigned on or called to answer any new charges and the one day waiting period would serve no purpose.

The exact time when a criminal offense is committed is not an essential element of a crime unless the statute defining the offense makes a date or time an indispensable element of the crime charged. *State v. Samayoa*, 292 Neb. 334, 873 N.W.2d 449 (2015). None of the statutes under which Simpson was charged make a date or time an indispensable element of the crime charged. See §§ 28-310.01, 28-707, 28-1212.02, and 28-1205. The only indirect reference to time is found in § 28-320.01 (child abuse), but other than defining the victim as a minor child, that statute, like the other relevant statutes, does not make a date or time an indispensable element of the crime charged. In count II, the original information advised Simpson that he needed to defend himself against an allegation that he "knowingly and intentionally cause[d] or permit[d] a minor child, K. S-C.[,] to be: placed in a situation that endanger[ed] his or her life or physical or mental health." The amendment to the information did not alter these essential elements of the crime alleged in count II. Nor did it alter the essential elements of any of the other crimes alleged. See *State v. Piskorski*, 218 Neb. 543, 357 N.W.2d 206 (1984) (no error in allowing State to amend information at end of its case-in-chief regarding date range of offense to conform to evidence).

At time of the State's amendment, Simpson could have asked for a continuance to further prepare his defense if he felt it necessary, but he did not do so. And, he does not argue on appeal that the amendment forced him to change any portion of his defense. By that point in the trial, he had already spent several days defending against the State's evidence, which showed that the events in question began on April 15, 2017, and continued into April 16. Simpson does not argue on appeal that the amendment to the information to conform to the dates established by the State's evidence unfairly prejudiced his defense, and he has not otherwise shown that it violated his right to due process.

Simpson waived arraignment on the original information and the amended information merely changed the date of the offense, at the conclusion of the State's case-in-chief, from "[o]n

or about 16 April 2017" to "[o]n or about 15 April 2017 through 16 April 2017." Simpson has failed to identify any authority to support his argument that he had to be arraigned again on the amended information and provided with one day before standing trial under these circumstances. With regard to his argument that he was not advised of the possible sentences under the amended information, Simpson cites to case law regarding the voluntariness of a plea, which is inapplicable here. Further, there was no change in the crime charged or in the possible sentences which would have required advisement. The district court did not abuse its discretion in permitting the State to amend the dates alleged in the information without again arraigning Simpson or again advising him of the possible sentences.

5. SENTENCING

Simpson asserts that the district court erred in imposing excessive sentences. He argues that the district court gave excessive weight to his criminal history and did not appear to give weight to any of the other relevant factors, that his sentences were excessive "in light of the Eighth Amendment," and that his sentence for assault by strangulation was "not within the statutory limits for the crime [he] was charged with and found guilty of." Brief for appellant at 4 and 23.

Simpson was sentenced to 3 to 3 years' imprisonment for assault by strangulation, a Class IIIA felony. § 28-310.01. This sentence was to run concurrently with the sentences for negligent child abuse (Class I misdemeanor) and unlawful discharge of a firearm (Class ID felony) but consecutive with the sentence for use of a deadly weapon (firearm) to commit a felony (Class IC felony). See §§ 28-707, 28-1212.02, and 28-1205. Ordinarily, Class IIIA felonies are punishable by up to 3 years' imprisonment and 18 months' postrelease supervision, a $10,000 fine, or both fine and imprisonment; and require a minimum of 9 months' postrelease supervision if imprisonment is imposed. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018). However, where, as here, a sentence of imprisonment for a Class IIIA felony offense committed on or after August 30, 2015, is ordered to run consecutively or concurrently with a sentence of imprisonment for a Class IC or a Class ID felony, the court is to impose an indeterminate sentence without a period of postrelease supervision. Neb. Rev. Stat. § 29-2204.02(4) (Reissue 2016). Simpson's sentence for his assault by strangulation conviction was within the statutory limits.

Simpson also relies on the fact that the information, amended information, and other documents in the record incorrectly identified assault by strangulation as a Class IV felony to argue that the district court imposed a sentence outside of the statutory limits. Class IV felonies are punishable by up to 2 years' imprisonment and 12 months' postrelease supervision, a $10,000 fine, or both, and require a minimum of 9 months' postrelease supervision if imprisonment is imposed. See § 28-105. However, assault by strangulation is clearly a Class IIIA felony, and the district court sentenced Simpson within the relevant statutory limits. See §§ 28-310.01 and 28-105. If the court had treated assault by strangulation as a Class IV felony in sentencing Simpson, it would have been plain error. See *State v. Betancourt-Garcia*, 295 Neb. 170, 887 N.W.2d 296 (2016), *abrogated on other grounds, State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020) (finding plain error in sentence when trial court treated conspiracy as Class II felony rather than Class IA felony pursuant to statute).

The sentences for Simpson's other convictions were also within the statutory limits. He was sentenced to imprisonment for 1 to 1 year for negligent child abuse. Class I misdemeanors are punishable by up to 1 year's imprisonment, a $1,000 fine, or both. Neb. Rev. Stat. § 28-106 (Reissue 2016) and § 28-707. And, he was sentenced to imprisonment for 15 to 25 years for unlawful discharge of a firearm and 20 to 30 years for use of a deadly weapon (firearm) to commit a felony. Class ID felonies are punishable by a mandatory minimum of 3 years' imprisonment and a maximum of 50 years; Class IC felonies are punishable by a mandatory minimum of 5 years' imprisonment and a maximum of 50 years. See §§ 28-105, 28-1212.02, and 28-1205.

The Eighth Amendment prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed. *State v. Becker*, 304 Neb. 693, 936 N.W.2d 505 (2019). The U.S. Supreme Court has characterized this as a "narrow proportionality principle" which does not require strict proportionality between crime and sentence, but, rather, forbids only extreme sentences that are grossly disproportionate to the crime. *State v. Becker, supra.* Under ordinary Eighth Amendment analysis, each sentence is considered separately, not cumulatively, for purposes of determining whether it is cruel and unusual. *State v. Becker, supra.* As noted above, Simpson's sentences were all within the relevant statutory limits. Eighth Amendment analysis generally respects legislative determinations of statutory sentencing limits. See *State v. Becker, supra*. Viewing Simpson's sentences individually, we conclude that each individual sentence imposed on him was well within the statutory limits and was not grossly disproportionate in violation of the Eighth Amendment.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020). However, the sentencing court is not limited to any mathematically applied set of factors. *State v. Archie*, 305 Neb. 835, 943 N.W.2d 252 (2020). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Martinez, supra*.

Prior to sentencing Simpson, the district court noted that it had reviewed the presentence investigation report (PSR). The court noted "the extreme seriousness" of the crimes of which Simpson had been convicted in this case, which occurred while he was on parole for a second degree murder conviction in Kansas City, Missouri. The court referenced the "extreme fear and fright" experienced by the victim in this case, stating that Simpson was "a danger to the public." At the time of the PSR, Simpson was 35 years old, had a GED, was single with one dependent, and was unemployed. His prior criminal history includes numerous convictions for tampering with a motor vehicle/airplane and felony possession of a controlled substance in addition to the second degree murder conviction. Overall on the level of service/case management inventory risk

assessment, he scored in the high risk range to reoffend. On the substance abuse questionnaire, Simpson scored in the maximum risk range on the antisocial behavior scale and in the problem risk range in the areas of drugs and violence.

The district court considered the relevant factors and did not impose excessive sentences or otherwise abuse its discretion in sentencing Simpson.

### 6. INEFFECTIVE ASSISTANCE OF COUNSEL

Simpson is represented on direct appeal by different counsel than trial counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020). Once issues of trial counsel's ineffective performance are properly raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.*

In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *Id.* When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

### (a) Failure to Object to Court's Judicial Notice

Simpson asserts that he received ineffective assistance of trial counsel when his counsel failed to object to the district court taking judicial notice of a nonadjudicated fact. At the State's request, the district court took judicial notice of the affidavit of the arrest warrant for Simpson during both days of the hearing on his motion to suppress, but a copy of the arrest warrant was not marked and included in the bill of exceptions. Papers requested to be judicially noticed must be marked, identified, and made a part of the bill of exceptions. *Bohling v. Bohling*, 304 Neb. 968, 937 N.W.2d 855 (2020). Even if the affidavit had been marked and included in the bill of exceptions for our review, the record is sufficient for us to determine that there was no prejudice

to Simpson in its admission. The police officer who prepared the affidavit testified extensively about doing so, and the State could have simply offered the affidavit as an exhibit as opposed to asking the court to take judicial notice of it. The suppression hearing proceeded on the understanding that Simpson was challenging the probable cause for his arrest and the single photographic lineup used during the interview of Copeland, and in addition to the testimony from the officer who prepared the affidavit, the State presented testimony at the hearing from two other officers who responded to and investigated the reports of gunshots and domestic violence. It is clear from this record that counsel's failure to object to the court's judicial notice of the affidavit did not prejudice Simpson.

### (b) Failure to Object to Testimony About Victim's Background

Simpson asserts he received ineffective assistance of trial counsel when his counsel failed to object to the victim's extensive, irrelevant, and prejudicial testimony about her background. We have already determined that any error in admitting this portion of Copeland' testimony was harmless error. See *State v. Devers*, 306 Neb. 429, 945 N.W.2d 470 (2020). Accordingly, Simpson cannot show that he was prejudiced by his counsel's failure to object to this testimony.

### (c) Failure to Object to Prior Bad Acts Evidence

Simpson asserts that he received ineffective assistance of trial counsel when his counsel failed to object regarding Simpson's prior bad acts after having his motion in limine sustained. In one motion in limine, Simpson sought to exclude any evidence regarding his prior convictions or that he physically abused or threatened Copeland on any date preceding the date of the alleged offenses or any other individual on any date. The district court sustained that motion. The court denied Simpson's second motion in limine, dealing with evidence about the data from his ankle monitor, with the understanding that such evidence, upon proper foundation at trial, would require mentioning that Simpson was on parole and that the State would not be allowed to solicit evidence of prior convictions tied to that parole.

In his brief, Simpson references Copeland's testimony that she learned Simpson moved to Omaha from Kansas City "when he had transferred his stuff" from there to Nebraska, in reference to him being "on some sort of electronic monitoring," and that she used to drive him to Kansas City for appointments. Copeland mentioned parole in describing when she learned that Simpson had been arrested for the crimes at issue here; Simpson's attorney objected and asked the court to strike "any mention of parole," which objection was overruled. Simpson also notes references in the State's opening and closing arguments to Simpson being on parole that were not challenged by his attorney.

Simpson also references testimony by Copeland about other behavior or statements by Simpson, some of which was objected to by his attorney. In describing their relationship, Copeland testified without objection about their arguments over topics such as Simpson plotting to kill people or wanting to rob banks. The court overruled a hearsay objection by Simpson when Copeland testified about him "seeing people [sic] faces that he had killed." She testified without objection that her cousin was "just using" Simpson and keeping him "close" because the cousin "knew [Simpson] was a shooter" and could "handle his business." This testimony was presented

- 15 -

in the context of Copeland explaining how she knew Simpson had gone to her cousin's house after one of their arguments. Finally, Simpson references a statement by Copeland during cross-examination that Simpson "would run to the girls because [Copeland] would be on his neck about the other things, the murders . . . the wanting to rob the banks, the car jackings, the chop shop stuff, stealing people [sic] cars." This statement was in response to questioning by Simpson's attorney about whether she was upset about Simpson "cheating" on her with other women.

Pursuant to § 27-404(2), evidence of "other crimes, wrongs, or acts" is not admissible "to prove the character of a person in order to show that he or she acted in conformity therewith," but it may be admissible for purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This is an inclusionary rule which permits the use of evidence of other crimes, wrongs, or acts if such is relevant for any purpose other than to show the defendant's propensity or disposition to commit the crime charged. See *State v. Myers*, 15 Neb. App. 308, 726 N.W.2d 198 (2006). An appellate court's analysis under this section, considers whether the (1) evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith, (2) probative value of the evidence is substantially outweighed by its potential for unfair prejudice, and (3) trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. See *id*.

Some of the testimony referenced by Simpson was not evidence of "other crimes, wrongs, or acts" under § 27-404(2), and he has not shown that any of it was offered to prove his "character" or that he "acted in conformity therewith." The evidence that Simpson was on parole was offered to provide the foundation for the evidence about GPS data from his monitoring device and was allowed under the district court's ruling on that motion in limine. We conclude that counsel's performance was not deficient in regard to admission of the evidence that Simpson was on parole.

Other evidence referenced by Simpson was offered to provide context for the deterioration of his relationship with Copeland and thus had some probative value. Even if this evidence was more prejudicial than probative as argued by Simpson, he cannot demonstrate that the result of the proceeding would have been different had the evidence been successfully objected to given the other substantial evidence to support his convictions. *State v. Anderson, supra*.

We reject Simpson's argument that his counsel was ineffective for failure to object to the evidence regarding his alleged prior bad acts.

(d) Failure to Address Sentencing Issues

Simpson asserts that he received ineffective assistance of trial counsel when his counsel failed to address the issues regarding Simpson's illegal sentence. This assignment of error is based on his assertion that his assault by strangulation conviction should have been treated as Class IV felony for purposes of sentencing based on how it was identified in the informations filed in this case. He argued that his attorney should have objected during sentencing when the prosecutor pointed out that it was actually a Class IIIA felony and should have questioned the district court when it stated that he was being sentenced on a Class IIIA felony. We have already determined above that the court would have erred in treating the assault by strangulation as a Class IV felony. See, *State v. Betancourt-Garcia*, 295 Neb. 170, 887 N.W.2d 296 (2016), *abrogated on other*

*grounds, State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020); §§ 28-310.01 and 28-105. Simpson's trial counsel was not ineffective for failing to address the correct classification of this crime during sentencing.

## VI. CONCLUSION

For the reasons set forth above, we affirm Simpson's convictions and sentences.

AFFIRMED.